IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| John Sayyah, *pro se*, et al., | ) Case No.: 01-CV-459 |
| | ) |
| Plaintiffs, | ) District Judge Watson |
| | ) Magistrate Judge Black |
| v. | ) |
| | ) MOTION BASED UPON NEW EVIDENCE |
| Waynoka Property Owners | ) RECEIVED 11/13/04, THAT IS SIGNIFICANT |
| Association, Inc,, et al., | ) TO THIS PENDING MATTER AT HAND |
| | ) |
| Defendants. | ) |
| | ) |

**NOW COME** Plaintiffs, and move to submit to this Court new critical evidence received by Plaintiff Sayyah 11/13/04 that is significant to this matter pending. Support for said motion is set forth more particularly in the accompanying memorandum.

## MEMORANDUM

### New Evidence Supports Plaintiffs' RICO Claims

While the "new" evidence does much to support their RICO claims, Plaintiffs re-affirm their "good faith" conviction that they have, properly and lawfully, responded and objected to M.J. Blacks's "Report and Recommendation," by their declaration of 11/08/04 to this Court that, based on the overwhelming abundance of supported federal controlling case law, fraud upon this Court vitiates and makes void said "Report and Recommendations."

### Prudent to Inform

Plaintiffs think it prudent to inform this Court and all parties concerned in this pending matter that the "information/documentation" provided by Sayyah" contained in the "new evidence" was first provided John Dunn, Chief of Deputies of the Brown County Sheriff's Department some months ago. Intrigued, Dunn logged over thirty-seven (37) hours at Sayyah's home going over the "information/documentation," in minute detail. Convinced Sayyah had provided him a

significant amount of probable cause evidence, Dunn contacted Kevin Brock, FBI Agent, and Bryan Carlson, Chief of the Ohio Bureau of Criminal Investigation. After some hurried phone conversations, it was decided that Dunn should drive up to see Carlson and after some additional conversation, left with Carlson the copious notes he had taken at Sayyah's home along with said information/documentation for Carlson's consideration and review.

After Carlson also became convinced the material was significantly incriminating, Carlson called Kenneth Marshall, Director of the Ohio Organized Crime Task Force, and discussed the situation with him. It was then decided that they would call Sayyah and make an appointment for both of them to visit with Sayyah at his home, which they did. After some four or more hours later, Carlson and Marshall then left Sayyah's home convinced that what they had reviewed and discussed indicated to both of them: "organized criminal activity."

Some days later, Marshall put in a call to Sayyah informing him that he was willing to launch a full blown organized crime investigation on the basis of "material" and their conversation, and had ordered Dunn and Carlson to put together a "field investigation plan of action" as to what was needed in the way of manpower and resources to bring the case forward. Marshall also agreed with Sayyah that there was a definite need to have a court appoint a receiver to continue the Lake's affairs with an order from said court to remove the manager and the board members.

One more thing, this was done prior to this "new evidence," which is devastating.

***In fact, as of this very moment 7:23PM 11/14/04, Sayyah has just finished speaking with Kenneth Marshall on his private cell phone who was having dinner with some officials in Los Angeles, informing him of the "new evidence" and Marshall told Sayyah to ASAP inform both Dunn and Carlson tomorrow as to the significance of the "new evidence."***

## NEW EVIDENCE

At a cost of over $25,000, certified fraud examiners, **Terry L. Yoho**, CPA, MA, CFE, BVAL, Director of Valuation Services, and **Randall S. Kuvin**, CPA, ABV Partner, both of

*Flagel, Huber, Flagel & Co.,* Certified Public Accountants, issued a Preliminary Findings that Plaintiff Sayyah received on the morning of 11/13/04, based upon a "fraud" examination which was conducted over a three day period, July 12, 13 and 14 of 2004, at the WPOA office located at Sardinia Ohio, based upon said information/documentation provided them by Sayyah.

**NOTE: "Preliminary Findings" is attached as exhibit A.**

## THE FINDINGS

In brief form, the ***devastating*** "Findings" states as follows:

**Page Two:**

- "[T]he information was obtained during our three days at Waynoka Property Owners Association, Inc…and other information/documentation obtained from Mr. John Sayyah…"

- "This report is considered a basis for extended investigation of management's activities, controls, and ***abuses of the system…***" (Emphasis added).

- "This Report expresses our opinion of the losses sustained and indications of potential loses which may result based on abuse of the system of internal controls…"

- "[T]here are several instances of irregularities, as well as system and asset abuse."

- "The overall cost to the Association may be material, may have been incurred over an extended period of time, and the actual and potential costs of ***fraud appear to be substantial***." (Emphasis added).

- In our opinion the losses sustained by the members of the Association are directly related to the following activities:

    - Violation of Board Directives
    - Check Writing Authority Abuse
    - Internal Control Issues/Circumvention of Control
    - Payroll ***fraud*** (Emphasis added)
    - Co-mingling Equipment and Funds
    - ***Personal use*** of WPOA Assets (Emphasis added)
    - Property Purchases/Sales Reported Incorrectly
    - ***Illegal*** Property Transfers
    - Allegations of ***Kickbacks*** (Emphasis added)
    - Audited Financial Statements and Accounting Issues
    - Accounts Receivable and Bad Debt Write-off
    - Other issues

**Page Eight:**

- "The following issues indicate *__abuse__* and *__circumvention__* of: the system of internal controls; rules and guidelines established by the Association; and *__personal use and abuse of association ASSETS__*. (Emphasis added).

**Page Nine:**

- "…based on examination of a few checks we noted the following:…[check number] 5362 [of] 3/23/2001 [for] $50,000 [written by] Timothy O'Farrell; [check number] 5326 [of] 3/23/2001 [for] $50,000 [written by] Timothy O'Farrell; [and] [check number] 5275 [of] 3/19/2001 [for] $100,000 [written by] Timothy O'Farrell…were issued for amounts over the signing authority without a Board Member signature [as required].

**Page Ten:**

- "Internal controls are either not in place or circumvented by management…"

- "The Board Members have a fiduciary duty to protect the assets of the Association and this may be interpreted as a *__breach of fiduciary duty__*. (Emphasis added).

- "We noted instances of purchase orders written after the fact instead of for approval of purchases. For example many purchase orders are dated the same as the date of the invoice or after the invoice date.

- "[Example]: An invoice for services rendered from Advanced Technical Aquatic Control for $6,000 was dated 3/28/2003 and the purchase order was dated 4/17/2003."

- "By completing the purchase order after the invoice was received, the staff created two purchase orders with attached invoices and **paid for the same item twice**. This circumvention of controls may result in overpayment of vendors as indicated by the duplicate purchase orders and duplicate payments for the carpet in the pool project. By writing purchase orders after an invoice is received, payment may be made for services or product *__never received__* or for vendors *__which do not exist__*. These examples indicate a lack of approval for purchases and invoice payments." (Emphasis added).

**Page Eleven: Payroll *FRAUD***

- "Bonuses and care allowances are not recorded as payroll or on a 1099 for the employees. For example check number 7009…to Tim O'Farrell for September car allowance signed by Vedia Johnson *__is not recorded__* on Mr. O'Farrell's payroll, W-2, or on a 1099. ." (Emphasis added).

- "…bonus checks approved by the Board *__are not recorded__* as payroll, W-2 or on a 1099. "

- "$4,000 bonus paid to Tim O'Farrell…was expensed [*illegally*] to the travel acct, 860-07."

- "...bonuses paid [*illegally*] but not recorded as income..."

- "...bonuses were expensed [*illegally*] to the capital pool account number 921-32."

- "The unreported income to the manager [Tim O'Farrell]...*is a federal VIOLATION*..." (Emphasis added).

**Page Twelve:**

- "...copier was purchased by WRWSD for tax advantages and that copier is used [*illegally*] by WPOA. [I]t was previously noted by the auditor...that this practice...[is] '...a major no-no in the eyes of the State.'"

- "...check number 942 written [*illegally*] on WPOA's capital checking account to WRWSD charged [*illegally*] to account 921-01 capital mowing."

- "...payments for WRWSD services are [*illegally*] deposited into WPOA accounts and checks are written [*illegally*] from the WPOA account to WRWSD."

- "Mr. O'Farrell has used WPOA assets [*illegally*] for personal use and has allowed other individuals [*illegally*] to use WPOA assets for personal use."

- "...Mr. O'Farrell arranged for WPOA to purchase new equipment...and confiscated the equipment for his own use and removed the equipment off of the [WPOA} premises to his farm...[and] did not ***reveal the THEFT*** until pressed by the vendor Gerald Hawthorne and the Board for either payment or surrender of the "used' WPOA equipment." (Emphasis added).

- "...the [above] incident indicates a ***deception*** by Mr. O'Farrell to the Board..." (Emphasis added).

**Page Thirteen:**

- "Lot inventory is incomplete...indicate lots...are sold and the income is not reported."

- "Lots are sold that Waynoka does not own."

- "...according to the Court of Common Pleas...Tim O'Farrell purchased lot #612 and lot #327 for $684.01 and $1,072.96 respectively...however, several months later...[he] recorded [*illegally*] [the] Value and Receipt as $373.00 for lot #612 and $995.00 for lot #327...[i]n addition, lot #612 was not added to Waynoka Inventory."

- "Significant amounts of accounts receivable are "forgiven"...[and] not listed on the balance sheet...and the Board and Members of the Association are not aware of the amount of the transactions."

- "Lots are not recorded properly from sale/transfer of lots.

- "Lots are recorded [*deceptively*] under a variety of name variations [*to hide theft*]."

- "…lack of attention, incompetence, <u>**or FRAUD**</u>, the lot inventory, and accounts receivable of the Association may be <u>*inaccurate*</u> and <u>*the difference could be material*</u>." (Emphasis added).

- "**Illegal Property Transfers** Lots are [*intentionally and deceptively*] registered under numerous variations of Waynoka names which make it difficult to follow transfers of properties, account for properties owned by WPOA, and increases the opportunity <u>*for*</u> <u>***FRAUD***</u>." (Emphasis added).

- "…Mr. Cutrell 'indicated that there are contract purchasers…[that have been] making payments are now looking for their deeds…are not the price that the buyer had paid."

### Page Fourteen:

- "[166 lots were transferred]…and [only] one of these lots were entered as part of Waynoka's inventory."

- "There are lots that are in the Association's name that are not on the inventory list."

- "Allegations have been made by more than one individual regarding Mr. O'Farrell's transfers of property with <u>*monetary kickbacks*</u> requested by Mr. O'Farrell." (Emphasis added).

### Page Fifteen:

- "Based on statements and affidavits from members…,[i]t appears that Mr. O'Farrell expects [*illegally*] a commission or finder's fee …[and] as this is a cash transaction, there is no audit trail available to review."

- "The audit of the [Association's] financial statements was performed by Kamphaus, Henning & Hood…however, the Association changed auditors and the current audit was performed by Balestra, Hari and Scherer CPA's…[and have detected] [t]hat there are some irregularities indicated in the financial statements."

- "[Suspiciously] [c]ertain asset accounts that should be adjusted do not change from year to year…"

- "Fixed assets, particularly vehicles/trucks/autos, have been disposed of annually (i.e. $41,670 net reduction in 2003) and other <u>*significant*</u> assets have been <u>*expensed*</u> instead of <u>*captilized*</u>." (Emphasis added).

- "...capital expenditures for the pool facility asset were stated at $750,000 per Mr. O'Farrell; however, the pool is capitalized for $453,875 and the other in-house costs of $300,000+ were expensed...[t]his encourages *theft* of assets..." (Emphasis added).

- "The recreation facility contracted with ADCM for $1,077,703 is capitalized as an asset with a cost to date of $332,094 which is listed...in the liabilities in 2003...[and] expensed and not recorded as an asset of the Association...[which] encourages *theft*..." (Emphasis added).

- "A comparison of the detailed lounge income versus the related expenses indicates *theft* of lounge assets in the form of inventory or recorded income (cash) *theft*...[and] Mr. O'Farrell is responsible for collection of cash received from the lounge and deposits in the bank." (Emphasis added).

**Page Sixteen:**

- "Some WRWSD expenses are incorrectly paid by WPOA...a [WRWSD] *tax exempt* invoice...[was] paid for by WPOA [to avoid paying sales tax—a ***violation***]."

- "According to a letter [from the auditor].... significant deficiencies in the design or operation of the internal structure that, in our judgment, could adversely affect Waynoka Property Owners Association's ability to record, process, summarize and report financial..."

- The letter "noted weaknesses in internal controls including commingling [a serious no-no according to the State of Ohio], accounts receivable and delinquent accounts, recording accounts payable and capital items on a monthly basis, and maintaining a complete list of lots held in inventory [which if properly listed could reveal the real estate scam]."

- "...accounts receivable [of] $1.5 million...by not reporting...when Mr. O'Farrell "adjusts" or reduces the fees on a property, no entry or audit trail is provided to trace the effect of the transaction [therefore, avoiding revealing the real estate scam]."

- "Mr. O'Farrell...can authorize improvements to certain properties...[and] is then in a position to purchase [those] properties that had been improved or offer [those] properties to certain individuals including Board members for their benefit."

**Page Seventeen:**

- "It appears that some of the prime locations available are not purchased by the Association and resold, but purchased privately and resold [real estate scam]."

- "Therefore, [while there may be a direct benefit or profit to Mr. O'Farrell and his "friends' willing to pay him a kickback] there is no direct benefit or profit for the Association for a "bargain" purchase of prime lots and resale."

- "The lake front property improvements are not conducted on all lake front properties or all vacant properties or random properties. This indicates that management and "insiders" are

potentially taking advantage of 'inside' information and/or equipment and improvements to properties at a cost to the Association for the benefit of a few (i.e. the manager)."

- "...the potential costs of **_FRAUD_** appear to be **_SIGNIFICANT_**.

## CONCLUSION

While the fraud examiners "Findings" are preliminary, and does support Plaintiffs' "many" RICO allegations of real estate scam, auditing scam, scamming the U.S. Internal Services, multi-million dollar fraud against the Association, the property owners, and while it does not address the "additional" allegations leveled by Plaintiffs of Fraud against the United States and the State of Ohio, its documented implication of "fraud" must now be taken seriously by this Court.

The consequences of "delay" cannot be avoided by this Court, any longer.

Those consequences are serious and impact the very lives not only Plaintiffs' but also over 2800 innocent and unwary property owners who are at risk every moment this pending matter is not allowed to go forward to trial. On behalf of those 2800 property owners, Plaintiffs beg this Court not to delay, but allow this case to go forward and let the chips fall where they will.

To do otherwise does not serve the ends of justice.

Respectfully submitted,

John Sayyah, *pro se*
238 Waynoka Drive
Sardinia, OH 45171
937-446-4136

Brenda Frank, *pro se*
273 Yuma Drive
Sardinia, OH 45171
937-446-4136

## CERTIFICATION OF SERVICE

We hereby certify that a copy of the foregoing was served by U.S. Mail on this 15th day of November, 2004 to Herbert Freeman, Attorney at Law, 114 East Eight Street, Cincinnati, OH, 45202, Stephen Yeager, Attorney at Law, One West Fourth Street, Suite 1800, Cincinnati, OH 45202, Michael P. Foley, Esq., 900 Fourth & Vine Tower, Five West Fourth Street, Cincinnati, OH 45202, Colleen Blandford, Attorney at Law, 1400 Carew Tower, 441 Vine Street, Cincinnati, OH 45202, Matthew Skinner, Attorney at Law, P.O. Box 145496, Cincinnati, Ohio 45250, and Steven Hengehold, One West Fourth Street, Suite 900, Cincinnati, Ohio 45202.

John Sayyah, *pro se*

Brenda Frank, *pro se*