

Waynoka Property Owners' Association, Inc.

PRELIMINARY FINDINGS

July 14, 2004



**FLAGEL, HUBER, FLAGEL & Co.**
CERTIFIED PUBLIC ACCOUNTANTS

Client 60177

Nov. 8, 2004

Re: Waynoka Property Owners' Association, Inc.

We are pleased to submit our preliminary findings from the information obtained during our three days at Waynoka Property Owners' Association, Inc. (hereafter "the Association") and other information/documentation obtained from Mr. John Sayyah, the Court, and other sources. Based on the limited amount of time available to us in the Waynoka office, this preliminary report will indicate initial findings and areas of concern which the Association or Members may wish to consider for further investigation. This report is considered a basis for extended investigation of management's activities, controls, and abuses of the system established by the Association and the Board for the benefit of the Association Members as a whole and not to benefit one member over other members.

This report expresses our opinion of the losses sustained and indications of potential losses which may result based on abuse of the system of internal controls and rules established by the Association. We have reviewed the available information, and as detailed in our report, there are several instances of irregularities, as well as system and asset abuse. The overall cost to the Association may be material, may have been incurred over an extended period of time, and the actual and potential costs of fraud appear to be significant. In our opinion the losses sustained by the members of the Association are directly related to the following activities (individually or collectively):

- Violation of Board Directives
- Check Writing Authority Abuse
- Internal Control Issues/Circumvention of Control
- Payroll Fraud

Donald R. Harting
Terrence P. Egan
James R. Hochwalt
Charles C. Craft
Randall S. Kuvin
Randolph N. Kramer
David P. Dirksen
Bruce G. Kreinbrink

Kelley G. O'Neil
Julie M. Kline
Dustin C. Fry
Terry L. Yoho
Linda B. Hadley
Alexander P. Kurian
Angela L. Gatto
Erin J. Kliesch
Steven D. Gates
Kevin R. Hagstrom
Michael W. Smith
Tommy J. Bargsley

RETIRED
David E. Flagel
Gerald P. Flagel
Arthur J. Huber
Louis G. Homan

DAYTON
3400 South Dixie Drive / Dayton, Ohio 45439-2304
phone: (937) 299-3400 / fax: (937) 293-5481 / www.fhf-cpa.com

CINCINNATI
9135 Governors Way / Cincinnati, Ohio 45249-2037
phone: (513) 774-0300 / fax: (513) 774-7250 / www.fhf-cpa.com

- Co-mingling Equipment and Funds
- Personal use of WPOA Assets
- Property Purchases/Sales Reported Incorrectly
- Illegal Property Transfers
- Allegations of Kickbacks
- Audited Financial Statements and Accounting Issues
- Accounts Receivable and Bad Debt Write-off
- Other Issues

In this Report, we consider the trend and nature of the Association, state of the economy and industry in which it operates, relationship between Waynoka Property Owner's Association (WPOA) and Waynoka Regional Water and Sewer District (WRWSD), Mr. Tim O'Farrell's role as manager of both WPOA and WRWSD, and the extended length of service of the Manager in place. Our analysis included consideration of the traceability of the losses, various approaches to value the loss, market, and other factors which may have influenced the operation and actions taken by the Association that we deemed pertinent to render this opinion. As this is a preliminary report, we have not attempted to project the amount of the losses or the extended period of time during which the losses were incurred; however, we included numerous examples of abuse with the associated cost of the losses incurred by the Association.

Based on the volume of supporting documents, including, but not limited to, copies of checks, letters, maps, documents, affidavits, financial information, court documents, government documents, etc. referred to in this report, they are maintained in a separate file and may be produced as required.

This letter should not be separated from nor considered independent of the attached Report of which it is part.

We certify to the best of our knowledge and belief:

- the facts and data reported and used in the Report are true and correct;

- the analyses, opinions, and conclusions in the Report are limited only by the assumptions and limiting conditions stated in the Report, and represent the unbiased professional analyses, opinions, and conclusions of Flagel, Huber, Flagel & Co. (FHF);

- neither FHF nor the undersigned have any present or prospective interest in the property, and have no personal interest or bias with respect to the parties involved;

- FHF's compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this Report;

Respectfully submitted,

**FLAGEL, HUBER, FLAGEL & CO**

By: _____
Randall S. Kuvin, CPA, ABV
Partner

By: _____
Terry L. Yoho, CPA, MA, CFE, BVAL
Director of Valuation Services

# TABLE OF CONTENTS

PAGE NO.

LETTER OF TRANSMITTAL/CERTIFICATION ............................................................. 2-4

INTRODUCTION ................................................................................................. 6

    Description of the Assignment ........................................................ 6
    Scope of the Engagement ............................................................... 6
    Procedures.................................................................................... 6


THE ASSOCIATION ............................................................................................ 7

    Background.................................................................................... 7
    Board of Directors ........................................................................ 7
    Related Party Transactions ............................................................ 7

LOSS ANALYSIS ................................................................................................ 8

    Approach...................................................................................... 8
    Violation of Board Directives......................................................... 9
    Check Writing Authority Abuse ..................................................... 9-10
    Internal Control Issues/Circumvention of Controls........................... 10-11
    Payroll Fraud................................................................................ 11-12
    Co-mingling Equipment and Funds.................................................. 12
    Personal use of WPOA Assets........................................................ 12-13
    Property Purchases/Sales Reported Incorrectly ................................ 13
    Illegal Property Transfers............................................................... 13-14
    Allegations of Kickbacks............................................................... 14-15
    Audited Financial Statements and Accounting Issues ....................... 15-16
    Accounts Receivable and Bad Debt Write-off.................................. 16
    Other Issues.................................................................................. 16-17

CONCLUSION.................................................................................................... 17

    Appendix A- Principal Sources of Information Reviewed ................... 18
    Appendix B- Qualifications of Appraiser.......................................... 19-22
    Appendix C- Assumptions and Limiting Conditions .......................... 23

# INTRODUCTION

## Description of the Assignment

FHF was retained by Mr. Robert Rickling to determine the losses, irregularities, and system abuses incurred by the Members of the Association as a result of mismanagement and/or malfeasance.

## Scope of the Engagement

Employing generally accepted procedures and methods, the report was completed based on documents and other information made available by the Association, Management, Mr. John Sayyah, Court Documents, etc. through the discovery process in litigation. The documents reviewed include, but are not limited to, invoices, credit memorandums, return authorizations, internal memorandums, letters, hand written documents, agreements, payroll records, maps, property records, cancelled checks, depositions, testimony, Board of director meeting minutes, financial statements, Association codes and regulations, market, economic, and industry data, and other financial information. We do not take responsibility for the accuracy or completeness of the information provided to us.

Based on time constraints in the Association office, we did not conduct interviews, and we were not provided any additional information after our initial visit which may have been useful in tracing the documents and claims to the source. This is a report of our preliminary findings and is not intended to be a complete report of all areas of abuse or all losses incurred by the Association.

The historical financial information, schedules, and adjustments presented in the report are solely included as support for the development of the report, and may contain departures from generally accepted accounting principles; therefore, they should not be used for any other purpose.

## Procedures

We traced transactions, credits, adjustments, etc. and reviewed documents for the purpose of determining the existence of irregularities in procedures promulgated by the Board of Directors, Association codes and regulations, and Agreements. Based on the extended time period involved and number of transactions, we focused our analysis on the period of 2001 through 2004. We did obtain some documents and information prior to 2001 and will indicate the irregularities found in this data. The financial statements were audited by Balestra, Harr & Scherer CPA's, Inc.

## THE ASSOCIATION

### Background

Founded in 1970, Lake Waynoka is a private gated community located in Brown County, Sardinia, OH. The Community is over 2,400 acres with over 4,000 lots. According to the Charter, a property owner must first become a member of the Waynoka Property Owners' Association (WPOA). The water and sewer for the Community is controlled by the Waynoka Regional Sewer and Water District (WRWSD) and the WPOA charge membership dues, assessments and fees. The property manager Timothy O'Farrell has been the manager of Waynoka Property Owners Association, Inc. and WRWSD for several years. Mr. O'Farrell is recently divorced and has been reprimanded by the Board as noted in his personnel file. The manager's employment agreement includes the following stipulations:

- A Project Board shall be kept by the Manager and a Project Board Report made at the first workshop each month. This report shall appear on the workshop agenda.
- All project requests shall be conveyed to the Manager in writing from the Board President. Each project shall be given a projected completion date. Copies of project requests shall be given to each Board Member and a file of such shall be maintained by the Board Secretary in a workshop folder.
- All project changes shall be included in the monthly Project Board Report.
- All deviations from accepted behavior shall be handled as defined in the personnel policy.
- All unbudgeted and/or over-budgeted expenditures shall require Board approval.
- The Manager shall maintain good verbal communications with all Board Members.
- All personnel terminations and layoffs shall be reviewed by the Board prior to implementation.
- All contractual events shall be covered by either a purchase order or a signed contract.
- Monthly comments will be expected from the Manager on his evaluation of his relationship with the Board.

### Board of Directors

According to the WPOA Restrictive Covenants and Code of Regulations, the Board shall be made up of nine members; each of whom is elected to serve a three year term of office.

### Related Party Transactions

Mr. O'Farrell is the manager of WPOA and WRWSD (Waynoka Regional Water & Sewer District). WRWSD is a public utility that services WPOA. Mr. O'Farrell commingles funds, equipment, etc. as described below and appears to operate the two entities as one entity.

## LOSS ANALYSIS

### Approach

In order for fraud to be committed, normally three elements must exist:

- Rationalization
- Pressure
- Opportunity

These elements are present in the management and operations of the Association. As indicated below:

- attitude that "the Board works for the manager" is stated in Mr. O'Farrell's review and his view that the Association assets are "his" assets available for personal benefit. This is exhibited by actual use of Association assets by the manager. (Rationalization)
- personal financial situation, divorce related issues, pressure to please individual members and the Board, and the pressure instituted by an annual performance review. (Pressure)
- the system of internal controls is virtually non-existent (Opportunity).

According to an article published in USA Today "Business Scandals Prompt Look into Personal Lives" "many executives implicated in recent corporate scandals exhibited other forms of questionable moral behavior along the way." Thomas DiBiagio, the U.S. Attorney for Maryland, prosecuted Chapman who was sentenced to 7 ½ years in prison for defrauding Maryland's state pension fund system and his three publicly held companies. Regarding the pattern of executives who are philanderer's committing fraud, Mr. DiBiagio states, "if their life is a lie, it's not confined to their personal life." Mr. DiBiagio continues, "If they are lying to their wives, there's huge potential they are **also lying to their colleagues, their Board of directors and potentially their auditors.**" Mr. DiBiagio says, "prosecutors investigate cases using **instincts and common sense** and recognize the traits philanderers and white-collar criminals might share."

We reviewed documents and information for irregularities, omissions, circumvention of the controls, abuse and misuse of Association assets. The following issues and irregularities were noted during our brief review of some of the documents available. The following issues indicate abuse and circumvention of: the system of internal controls; rules and guidelines established by the Association; and personal use and abuse of Association assets.

## Violation of Board Directives

Timothy O'Farrell, the manager, takes actions in direct violation of Board Directives. For example, Mr. O'Farrell gave certain employees raises after he was instructed that there was a wage freeze (formal reprimand on Aug. 16, 1996). Mr. O'Farrell makes decisions and purchases items which, according to the Board, require three (3) bids and/or Board Approval. Typically, the Board learns of Mr. O'Farrell's actions that affect the Association after the fact (noted in Board of Directors' Meeting Minutes). This approach is affirmed in Mr. O'Farrell's annual evaluation in which a Board member stated, "you still give the impression on occasion that the Boards work for you instead of the reverse."

Another example is the pool project that cost over $700,000. A bid for the pool project for $439,500 from Klimate Masters was a competitive bid and was approved; however, any expenditures over $10,000 are required to have competitive bids submitted and approved by the Board. The majority of the remaining expenditures were not competitively bid or selectively approved by the Board. We did not see signed delivery receipts for supplies, equipment, concrete, etc. and could not trace all of the expenses charged to the pool; therefore, expenses charged to the pool may or may not have been incurred to build and improve the pool.

## Check Writing Authority Abuse

According to Board rules, payroll checks are to be signed solely by the Manager. Checks are written by the Manager and office staff for amounts higher than the approved limit. We did not note any return of checks by the banks for violation of Board approved signing limits, indicating that there may not be any signing limit established at the banks. There are several bank accounts and different banks used by Mr. O'Farrell for Association Funds. We discussed check writing authority with Mr. O'Farrell who informed us that the office staff had check writing authority up to $500.00 and that Mr. O'Farrell had check writing authority up to $2,500 excluding utilities. According to the Rules & Regulations of the Board of Trustees, checks for amounts over the signing authority are to be signed by a second (Board Member) signature; however, based on examination of a few checks we noted the following:

| Check Number | Date | Amount | Signature |
|---|---|---|---|
| 5339 | 3/28/2001 | $ 553.87 | Carol Dotson |
| 5283 | 3/21/2001 | $ 553.86 | Vedia Johnson |
| 7058 | 9/12/2001 | $ 507.95 | Vedia Johnson |
| 5362 | 3/27/2001 | $ 50,000.00 | Timothy O'Farrell |
| 5326 | 3/23/2001 | $ 50,000.00 | Timothy O'Farrell |
| 5275 | 3/19/2001 | $100,000.00 | Timothy O'Farrell |

Therefore, checks were issued for amounts over the signing authority without a Board member signature.

There are numerous bank accounts including:

| Bank | Routing Number/Account |
|---|---|
| National Bank & Trust | 042204932 11170235 |
| National Bank & Trust | 50210493 11092561 |
| National Bank & Trust | 042204932 11150153 |
| National Bank & Trust | 50210493 1110718 |
| National Bank & Trust | 042204932 025288 |
| Fifth Third Bank | 042207735 73374003 |

We are unaware of any bonding of the manager, Board, or office staff; therefore, it appears that the manager and others may write checks for unlimited amounts.

## Internal Control Issues/Circumvention of Controls

Internal controls are either not in place or circumvented by management and office staff. Separation of duties is a basic internal control. In addition the person who approves an invoice should not be the person entering the payable or signing the check payment. Upon examination of a few checks, we noted that checks are written to the check signer. Therefore, the manager and the office staff can make out checks to themselves, sign it, and cash it with no signing limits enforced by the Board or the Bank. Some examples of payroll checks written to the same person who signed the check are as follows:

| Check Number | Date | Payee | Signature |
|---|---|---|---|
| 6982 | 9/5/2001 | Vedia Johnson | Vedia Johnson |
| 7115 | 9/19/2001 | Vedia Johnson | Vedia Johnson |
| 7172 | 9/26/2001 | Vedia Johnson | Vedia Johnson |
| 7009 | 9/5/2001 | Timothy O'Farrell | Timothy O'Farrell |

We are unaware of any bonding of the manager or staff and hundreds of thousands of dollars are in the hands of the manager and the office staff who can write checks for any amount. The Board Members have a fiduciary duty to protect the assets of the Association and this may be interpreted as a breach of fiduciary duty.

We noted instances of purchase orders written after the fact instead of for approval of purchases. For example many purchase orders are dated the same as the date of the invoice or after the invoice date. An invoice for services rendered from Advanced Technical Aquatic Control for $6,000 was dated 3-28-2003 and the purchase order was dated 4-17-2003. Another example is an invoice for carpet for the pool project. By completing the purchase order after the invoice was received, the staff created two purchase orders with attached invoices and paid for the same item twice. This circumvention of controls may result in overpayment of vendors as indicated by the duplicate purchase orders and duplicate

payments for the carpet in the pool project. By writing purchase orders after an invoice is received, payment may be made for services or product never received or for vendors which do not exist. These examples also indicate a lack of approval for purchases and invoice payments.

**Payroll Fraud**

Bonuses and car allowances are not recorded as payroll or on a 1099 for the employees. For example check number 7009 on 9/5/2001 to Tim O'Farrell for September car allowance signed by Vedia Johnson is not recorded on Mr. O'Farrell's payroll, W-2, or on a 1099. This is a monthly check over a period of several years. In addition, bonus checks approved by the Board are not recorded as payroll, W-2, or on a 1099. Mr. O'Farrell received bonuses in several years for thousands of dollars and this amount does not include any bonus or allowance which has been paid by WRWSD. For example, Mr. William Marshall, President of WRWSD approved a bonus of $3.000 to Mr. O'Farrell for completing Phase II Sewer Line Extension. The $4.000 bonus paid to Tim O'Farrell on 4/11/2002 was expensed to the travel acct. 860-07. Another example is bonuses paid but not recorded as income to several employees on 3/11/2003 as follows:

| Check Number | Employee | Amount |
|---|---|---|
| 864 | Randy Pike | $ 500.00 |
| 865 | Steve Sanders | $ 500.00 |
| 866 | Scott Dabe | $ 500.00 |
| 867 | John Dunn | $ 500.00 |
| 868 | George Culver | $ 500.00 |
| 869 | Greg Conley | $ 500.00 |
| 870 | Jimmy Van Hoose | $ 500.00 |
| 871 | Vedia Johnson | $ 500.00 |
| 872 | Carol Dotson | $ 500.00 |
| 873 | Kay Bundy | $ 500.00 |
| 874 | Nancy Dabe | $ 500.00 |
| 875 | Timothy O'Farrell | $ 4,000.00 |
| 876 | Dan Williams | $ 500.00 |
| **Total** | | **$10,000.00** |

These bonuses checks were expensed to the capital pool account number 921-32. The unreported income to the manager and staff is a federal violation and can result in significant fees, penalties, and interest to the individuals involved, WPOA, and WRWSD. In addition. Mr. O'Farrell's *annual* unreported income ($4,300 mileage + $4,000 bonus WPOA + $3,000 bonus WRWSD + any other cash/profit commission from the Association and transfer of properties) would not be reported for child support or alimony calculations and payments.

### Co-mingling Equipment and Funds

WRWSD is a public utility. Equipment owned by WRWSD is not to be loaned, rented, etc. to a private entity including WPOA. Mr. O'Farrell stated that a copier was purchased by WRWSD for tax advantages and that copier is used by WPOA. This statement is confirmed by Board of Directors meeting minutes of Jan. 9, 1999 and it was previously noted by the auditor (Kamphaus, Henning & Hood) in a letter to Tim O'Farrell dated February 26, 1993 that this practice of a private organization using equipment that belongs to a public utility "would be a major no-no in the eyes of the State." According to the notes to the audited financial statements as of February 29, 2004 and February 28, 2003 completed by Balestra, Harr & Scherer CPA's, Inc. related party transactions include WPOA leasing the copier from WRWSD as of February 3, 1999 and WPOA leases a portion of the district maintenance building from WRWSD for $1,586 per year.

Another example is check number 942 written on WPOA's capital checking account to WRWSD charged to account 921-01 capital mowing. In addition, payments for WRWSD services are deposited into WPOA's accounts and checks are written from the WPOA account to WRWSD.

### Personal use of WPOA Assets

Mr. Timothy O'Farrell has used WPOA assets for personal use and has allowed other individuals to use WPOA assets for personal use. For example, as noted in the Board of Trustees Meeting on April 10, 1999, Mr. Timothy O'Farrell arranged for WPOA to purchase new equipment (mowers/bush hogs) because the present equipment was not in "good working order"; however, Mr. O'Farrell confiscated the equipment for his own use and removed the equipment off of the premises to his farm. This allegation is supported by affidavits by the vendor Mr. Gerald Hawthorne and supported by an affidavit of Shirley Hempfling, a Trustee of WPOA and other Board members. Mr. Gerald Hawthorne on June 4, 1999 delivered the new equipment and attempted to collect the used equipment; however, one of the mowers was not on the premises. Mr. O'Farrell did not reveal the theft until pressed by the vendor Gerald Hawthorne and the Board for either payment or surrender of the "used" WPOA equipment. If the equipment was not in "good working order" why did Mr. O'Farrell confiscate it for his own use on his property and refuse to surrender it to the equipment vendor? This indicates that the equipment was in good working order. In addition, the incident indicates a deception by Mr. O'Farrell to the Board that WPOA needed to purchase new equipment when obviously the equipment was in working order as indicated by Mr. O'Farrell's possession and use of the equipment.

Based on a notarized statement by Nadine Kautz who was a Security Officer at WPOA, on Sept. 20, 1999 while she was on duty, Fred Daulton a police officer in Georgetown, Ohio stated that he was there with permission from Mr. O'Farrell to pick up a camper (registered to Mrs. Byrd) and two pontoon boats from the locked storage area. When it was realized that the property was gone, Mr. O'Farrell was notified and instructed to contact Mr. Daulton

to return the property. According to Board minutes of Oct. 1, 1999, this incident was noted and apparently a boat motor was also missing. This may have been a lack of security; however, if the Manager did not authorize Mr. Daulton to take the pontoon boats and camper, why didn't he file a stolen goods report with the authorities?

## Property Purchases/Sales Reported Incorrectly

Lot inventory is incomplete which may indicate lots owned by the Association are sold and the income is not recorded. In addition, without a complete inventory listing, lots are sold that Waynoka does not own.

On April 10, 2000, according to the Court of Common Pleas, Brown County, Tim O'Farrell purchased lot #612 and lot #327 for $684.01 and $1,072.96 respectively under Waynoka Property Owners' Assoc. and under Waynoka Property Owners; however, several months later on Aug. 22, 2000, Mr. O'Farrell recorded the Real Property Conveyance Fee Statement of Value and Receipt as $373.00 for lot #612 and $995.00 for lot # 327. In addition, lot #612 was not added to Waynoka Inventory.

Significant amounts of accounts receivable are "forgiven" by the manager and because the accounts receivable are not listed on the balance sheet, the Board and Members of the Association are not aware of the amount of the transactions.

Lots are not recorded properly from sale/transfer of lots. Lots are recorded under a variety of name variations. The Office staff has relied on outside sources for a listing of Waynoka property owned and fees owed (re: Letter from Carol Dotson to National American Corp. requesting lot listings and fee info). Based on the lack of attention to detail, incompetence, or fraud, the lot inventory, and accounts receivable of the Association may be inaccurate and the difference could be material.

## Illegal Property Transfers

Lots are registered under numerous variations of Waynoka names which make it difficult to follow transfers of properties, account for properties owned by WPOA, and increase the opportunity for fraud. The attorney for the WPOA, Jay D. Cutrell, attempted to transfer/deed two lots which were not owned by WPOA but were owned by National American Corporation. According to a letter dated December 15, 1987, Mr. Cutrell "indicated that there are contract purchasers for both properties making payments to Westinghouse Credit Corporation and that these purchasers are now looking for their deed." National American Corporation offered to sell the lots though the price per lot would be $915 and not the price that the buyers had paid. We do not have information of the result of this transaction.

Properties are registered under the follow names and may be listed under other names:

- 13 -

1.  Waynoka Property Owners

2.  Waynoka Property Owners Assn

3.  Waynoka Prop Owners Assoc Inc

4.  Waynoka Property Owners Assoc I

5.  Waynoka Property Owners Ass'n I

6.  Waynoka Property Owners Assn In

7.  Waynoka Property Owners Assoc

8.  Waynoka Prop Owners Assoc

9.  Waynoka Prop Owners Assoc Inc

10. Waynoka Prop Oweners Assoc Inc

11. Waynoka Prop Owners Assic Inc

Other similar names:

12. Waynoka Development Corp

13. Waynoka Dev Corp

14. Waynoka Develop Corp

15. Waynoka Develop Corp Natl Ameri

According to the real estate transaction closed at the law offices of McConn & Cutrell, one hundred twenty-six (126) lots at Lake Waynoka were transferred from Waynoka Development Corp. to WPOA for $25,200 excluding selling expenses of $77.00. A letter from Mr. Cutrell dated September 12, 1992, supports the transaction and a quit claim deed indicates the lots transferred. Mr. Cutrell submitted an invoice for examination of 166 lots at $30 per lot but does not indicate the additional 40 lots (166-126 lots transferred) which required examination. It is uncertain that these lots were entered as part of Waynoka's inventory as we do not have an inventory list as of the date of transfer and only one lot #1313 is entered on the current lot inventory at a cost of $200 (the agreed price per lot).

The WPOA inventory listing indicates that many of the lots obtained were at zero cost to Waynoka. There are lots that are in the Association's name that are not on the inventory list. For example lot #3527 was one of the lots transferred to the Association that is not on the inventory list: however, according to the Brown County records, it is owned by the Association.

## Allegations of Kickbacks

Allegations have been made by more than one individual regarding Mr. O'Farrell's transfers of property with monetary kickbacks requested by Mr. O'Farrell. This appears to be a

conflict of interest as Mr. O'Farrell is acting manager of WPOA and his duties include sales of property for the benefit of WPOA, not personal benefit. Based on statements and affidavits from members (Brenda Frank), it appears that Mr. O'Farrell expects a commission or finder's fee for notifying and transferring properties to Members. Using inside information, this again is an example of benefiting a few instead of the Association and Members as a whole; however, as this is a cash transaction, there is no audit trail available to review. In addition, an "Anti-Kickback" provision recognizes the potential for a kick-back and strictly prohibits acceptance of any gift or gratuity by Board members, member of the family of a Board member, or by any employee in excess of $25.

A letter from Jay Cutrell, attorney, to Stanley Purdy, attorney, dated September 3, 1997 indicates that Tim O'Farrell "has been in contact with the owners of the lot adjoining lot 3505 owned by Stanley Roat." The property is to be transferred by Quit Claim Deed to the owners of lot 3506 (Gary and Brenda Franks) who, according to Mr. Cutrell, "are not willing to pay anything for the lot." This transfer would be in full satisfaction of the settlement agreement (i.e. forgive all delinquent fees) but Mrs. Roat would have to pay the taxes before transfer. This transaction results in a loss of the delinquent fees, and loss of the value of the property to the Association. Most individuals would jump at the chance to receive adjoining property "free" of charge. What is the Manager's motivation for this transaction and is the transaction actually "free" to Gary and Brenda Franks?

## Audited Financial Statements and Accounting Issues

The audit of financial statements was performed by Kamphaus, Henning & Hood; however, the Association changed auditors and the current audit was performed by Balestra, Hart, and Scherer CPA's. There are some irregularities indicated in the financial statements.

Certain asset accounts that should be adjusted do not change from year to year (i.e. prepaid insurance, prepaid expenses). Fixed assets, particularly vehicles/trucks/autos, have been disposed of annually (i.e. $41,670 net reduction in 2003) and other significant assets have been expensed instead of capitalized. For example, the capital expenditures for the pool facility asset were stated at $750,000 per Mr. O'Farrell; however, the pool is capitalized for $453,875 and the other in-house costs of $300,000+ were expensed. The recreation facility contracted with ADCM for $1,077,703, is capitalized as an asset with a cost to date of $332,094 which is the amount of the NBT loan (amount withdrawn) listed in the liabilities in 2003. Therefore, any other costs (in-house) are not capitalized, and it appears that fixed assets are expensed and not recorded as an asset of the Association. This encourages theft of assets as fixed assets of the Association are not listed on a depreciation schedule and therefore, are not accounted for as an asset of the Association.

A comparison of the detailed lounge income versus the related expenses indicates theft of lounge assets in the form of inventory or unrecorded income (cash) theft. Either the income is too low or the expenses are too high based on normal industry markup/profit margin rates. According to the office staff, Mr. O'Farrell is responsible for collection of cash received

from the lounge and deposits in the bank. An example of lounge income and expense fraud is cigarette costs in 2002 were 99% of cigarette sales and in 2003 these expenses were 79.3% of sales. Inventory from year to year for the lounge does not vary significantly and does not account for the variances in profit margins reported for beer, wine, cigarettes, etc.

Some WRWSD expenses are incorrectly paid by WPOA. For example, on April 1, 2003 a *tax exempt* invoice from Advanced Technical Aquatic Control, LLC for minnows for the sewer lagoon that is owned and operated by WRWSD were partially (1/2) paid for by WPOA.

According to a letter dated April 6, 1999 from the auditors, Kamphaus, Henning, and Hood, to the Board indicates that there were "significant deficiencies in the design or operation of the internal structure that, in our judgment, could adversely affect Waynoka Property Owners Association's ability to record, process, summarize and report financial data consistent with the assertion of management in the financial statement" In addition, "a material weakness ...of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions." The auditors noted weaknesses in internal controls including commingling of funds, accounts receivable and delinquent accounts, recording accounts payable and capital items on a monthly basis, and maintaining a complete list of lots held in inventory. The auditors noted some of the weaknesses in internal controls; however, the controls have not been corrected and the auditors were not specifically looking for fraud but adjusting their audit procedures for weak controls.

### Accounts Receivable and Bad Debt Write-off

The definition of a bad debt is probable and estimateable. A bad debt is an uncollectible account receivable. The audited financial statements are presented on the accrual basis however, accounts receivable are not indicated in the financial statements or in the notes to the financial statements. Board meeting minutes indicate that accounts receivable could be $1.5 million which appears to be material. By not reporting the accounts receivable, when Mr. O'Farrell "adjusts" or reduces the fees on a property, no entry or audit trail is provided to trace the effect of the transaction.

### Other Issues

Mr. O'Farrell is aware of and can authorize improvements to certain properties using WPOA equipment, personnel, and assets. He is then in a position to purchase properties that had been improved or offer properties to certain individuals including Board members for their benefit. For example, lake front property lots 774 and 775 were owned by Arnold Riffle who owed back taxes and assessments as of 2001, in which his property was to be auctioned.

Mr. Riffle's lots were transferred privately and not through the Association. According to the Brown County Auditor's records, lots 774 and 775 were recently sold for $15,000 each in 2004. Mr. O'Farrell can write off the delinquent fees and assessments on a property, resulting in a low price or zero purchase price for the property. It appears that some of the prime properties available are not purchased by the Association and resold, but purchased privately and resold. Therefore, there is no direct benefit or profit to the Association for a "bargain" purchase of prime lots and resale. The Association loses back fees and assessments that are "forgiven" by the manager. There are allegations that improvements may have been made to another lake front property before the President of the Board (Liz Freeman) purchased the property and Ms. Freeman currently owns lake front property as part of lots 483, 484, 485, 486, & 487; however, as maintenance records for this property were unavailable, the timing of improvements is speculative.

The lake front property improvements are not conducted on all lake front properties or all vacant properties or random properties. This indicates that management and "insiders" are potentially taking advantage of "inside" information and/or equipment and improvements to properties at a cost to the Association for the benefit of a few (i.e. the manager).

## CONCLUSION

We have reviewed the available information, and as detailed in our report, there are several instances of irregularities, as well as system and asset abuse. The overall cost to the Association may be material over an extended period of time and the actual and potential costs of fraud appear to be significant.

## PRINCIPAL SOURCES OF INFORMATION REVIEWED

External Documents

1.  Affidavits

2.  Court Documents

3.  Property Transfer Documents

4.  Property Records

5.  National Economic Review

6.  Internet Sources

7.  Articles

8.  Documents received from discovery procedures conducted by John Sayyah

9.  Maps


Internal Documents of the Association

1.  Agreements

2.  Regulations and Rules of Conduct

3.  Board Meeting Minutes

4.  Various management prepared documents, correspondence, schedules, and budgets.

5.  Trial balances.

6.  Audited financial statements and federal tax returns (1120) prepared by Kamphaus, Henning, and Hood or Balestra, Harr & Scherer.

7.  Board of Director meeting minutes.

8.  Assorted invoices, purchase orders, checks, statements, and other source documents.

9.  Lot and Accounts Receivable information

## RANDALL S. KUVIN, CPA , ABV
## CURRICULUM VITAE

### EDUCATION

Bachelor of Science in Business (Accountancy Major), Miami University – May 1985

Certified Public Accountant - August, 1987

Completed over 150 hours of continuing professional education courses on business valuation and related topics

Certificate of Educational Achievement – Advanced Business Valuation – awarded by the American Institute of Certified Public Accountants, December 10, 1999

Accredited in Business Valuation (ABV) – February, 2001

### EXPERIENCE

Flagel, Huber, Flagel & Co., CPA's    (July 1, 1985 to present)

- Partner - October 1995 to present

- Manager - July 1990 to September 1995

- Coordinator, Business Valuations and Litigation Services Department – July, 1990 to present

- Performed over 250 business valuations - 1987 to present

### MEMBERSHIPS

American Institute of Certified Public Accountants

Ohio Society of Certified Public Accountants, Litigation Services Committee

The Institute of Business Appraisers, Inc.

Associated Builders and Contractors, Inc.

### EXPERT WITNESS TESTIMONY/DEPOSITION

1. Domestic relations – valuation of trucking company; 2001; Hamilton County; (Simmons v. Simmons).
2. Domestic relations – valuation of trucking company; 2001; Greene County; (Cronin v. Cronin).
3. Domestic relations – valuation of plumbing contractor; 2000; Warren County; (Mitchell vs. Mitchell).
4. Domestic relations – valuation of neighborhood bar; 1999; Montgomery County; (Wilson vs. Wilson).

Randall S. Kuvin
Curriculum Vitae
Page 2.

## EXPERT WITNESS TESTIMONY/DEPOSITION (CONTINUED)

5.  Domestic relations – valuation of wholesale fluid power equipment distributor; 1999; Butler County; (Schmitt vs. Schmitt).

6.  Domestic relations – valuation of manufacturer of flexible magnets; 1999; Warren County; (Mosteller vs. Mosteller).

7.  Domestic relations – valuation of Longaberger distributorship; 1999; Montgomery County; (Early vs. Early).

8.  Domestic relations – valuation of wholesale wood pallet distributor; 1998; Warren County; (Riling vs. Riling).

9.  Domestic relations - valuation of otolaryngology practice; 1998; Butler County; (Hermann vs. Hermann).

10. Domestic relations – valuation of wholesale dairy products distributor; 1994; Montgomery County; (Stefanoff vs. Stefenoff).

11. Domestic relations - valuation of family restaurant chain, valuation of annuity; 1994; Montgomery County;          (Office vs. Office).

12. Domestic relations - valuation of steel fabrication company; 1994; Clark County; (Detwiler vs. Detwiler).

13. Domestic relations - valuation of machine tool and equipment service/repair company; 1993; Montgomery County;          (Klimaski vs. Klimaski).

14. Domestic relations - valuation of independent insurance agency; 1992; Montgomery County; (Landis vs. Landis); court appointed.

15. Domestic relations - valuation of bookkeeping and tax practice (non - CPA); 1992; Greene County; (James vs. James).

16. Domestic relations - valuation of commercial industrial construction general contractor; 1992; Shelby County;          (Richey vs. Richey).

17. Domestic relations - valuation of pathology practice; 1992; Montgomery County; (Jang vs. Jang).

18. Domestic relations - valuation of commercial construction subcontractor; 1991; Clinton County; (Smallwood vs. Smallwood).

Terry L. Yoho, CPA, MA, CFE, BVAL
Curriculum Vitae
Page 2

## Experience

### Barnes, Wendling, Cook & O'Connor, Inc., CPAs  (1984 – 1992)
### Director of Management Advisory Services

Responsible for business valuations, internal and client computer systems, staff and client seminars, projections and forecasts, business planning, loan packages, employment services for clients, and other business advisory services.

## Professional Associations and Memberships

Association of Certified Fraud Examiners (Certified Fraud Examiner – **CFE**)

Institute of Business Appraisers – ( Business Valuator Accredited in Litigation - **BVAL**)

American Institute of Certified Public Accountants (Certified Public Accountant - **CPA**)

American Society of Appraisers

Ohio Society of Certified Public Accountants - Past Chairman of the Management Services Committee

Named in Strathmore's Who's Who Millennium Edition and Who's Who of Rising Young Americans

## Instructor and Lecturer

- Cincinnati Business Valuation Roundtable - Founder and speaker on various business valuation topics
- Attorney Seminars - Ohio Supreme Court approved CLE course - Business Valuations
- National Business Institute – Speaker for Equitable Distribution in Divorce Settlements in Ohio
- Dayton Association of Tax Professionals – Guest Lecturer on Business Valuations
- Institute of Management Accountants - Bankruptcy Preferences:  How to get Your Money and Keep It
- Cleveland State University - Guest lecturer on computer accounting software
- Internal and Client Seminars - Accounting software packages and software applications (Excel, Windows, Solomon, MAS90, Quicken, Word, etc.)
- Catholic Diocese - Course on "How to Prepare a Loan Package"
- Financial Institutions - Financial Statement Analysis
- Ohio Society of Certified Public Accountants - Guest lecturer at various computer seminars

## Testimony

Expert Witness

Appendix C

## ASSUMPTIONS AND LIMITING CONDITIONS

This report is subject to the following assumptions and limiting conditions:

1. Information, estimates, and opinions contained in this report are obtained from sources considered reliable; however, no liability for such sources is assumed by FHF.
2. The projections, historical financial information, schedules, and adjustments presented in the report are solely included as support for the development of the report, and may contain departures from generally accepted accounting principles; therefore, they should not be used for any other purpose.
3. Client Company and its representatives warranted to FHF that the information supplied to FHF was complete and accurate to the best of the client's knowledge; and that any reports, analysis, or other documents prepared for it by FHF will be used only in compliance with all applicable laws and regulations. FHF has not assumed any responsibility for independent verification of information supplied by the client or its representatives.
4. Possession of this report, or a copy thereof, does not carry with it the right of publication of all or a part of it, nor may it be used for any purpose by anyone but the client without the previous written consent of FHF or the client, and in any event only with proper attribution.
5. FHF is not required to give testimony in court, or be in attendance during any hearings or depositions, with reference to the Association, unless previous arrangements have been made. FHF is committed to supporting the report provided compensation arrangements for such additional services are made.
6. The various estimates/examples of loss presented in this report apply to this analysis only, and may not be used out of the context presented herein. This report is valid only for the purpose specified herein.
7. This analysis assumes that the company will continue to operate as a going concern, and that the character of its present business will remain intact.
8. The analysis contemplates facts and conditions existing as of the report date. Events and conclusions occurring after that date have not been considered, and FHF has no obligation to update our report for such events and conditions.
9. This opinion is subject to the understanding that the obligations of FHF in the analysis are solely corporate obligations, and no officer, director, employee, agent, shareholder or controlling person of FHF shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.
10. By accepting this report, the client acknowledged the terms and indemnity provisions provided in the executed engagement letter and the terms and conditions contained in these assumptions and limiting conditions.